**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | |
|---|---|
| ADRIENNE VANSSEA CLAUSEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 5:13-CV-23 |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

Plaintiff Adrienne Vanessa Clausen ("Clausen") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f. Specifically, Clausen alleges that the Administrative Law Judge ("ALJ") erred in not finding a listing level impairment, improperly giving the opinion of her treating physician less than controlling weight, and discrediting her subjective complaints of pain.[2] This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), and this case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed and argued all issues, and the case is ripe for decision. I have carefully reviewed the administrative record, the

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

[2] In her brief, Clausen also asserted error on the grounds that the ALJ improperly applied the doctrine of *res judicata* and that her alleged onset date should be June 1, 2008. Pl's Br. Summ. J. 13–14. At oral argument, Clausen conceded (and the Commissioner agreed) that the contention was moot since she previously amended her alleged onset date to June 1, 2009. R. 66.

1

legal memoranda, the arguments of counsel, and the applicable law. I conclude that substantial evidence supports the ALJ's finding that Clausen did not meet the criteria of a listed impairment, and the ALJ's evaluation of the opinion evidence of Clausen's treating physician and Clausen's subjective complaints. Accordingly, I **RECOMMEND DENYING** Clausen's Motion for Summary Judgment (Dkt. No. 16), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 21.

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Clausen failed to demonstrate that she was disabled under the Act. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Clausen bears the burden of proving that she is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily

activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in any and all forms of substantial gainful employment given the claimant's age, education, and work experience. See 42 U.S.C. § 423(d)(2).

The Commissioner uses a five-step process to evaluate a disability claim. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## STATEMENT OF FACTS

### Social and Vocational History

Clausen was born on March 17, 1970 (Administrative Record, hereinafter "R." at 50, 151, 157), and was classified as a younger person on her alleged onset date. R. 39, 70; 20 C.F.R. §§ 404.1563(c), 416.963(c). Clausen's last insured date is December 31, 2013. R. 30. Clausen must show that her disability began before that date and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). Clausen attended one year of college and received her GED. R. 51. Clausen

3

previously worked as a certified nursing assistant ("CNA"), cook, construction worker, restaurant housekeeper, and most recently as package handler. R. 70, 71, 227, 267, 321, 346. Clausen reported that during the relevant period, she had the capacity to use a computer, read, handle her personal care with some assistance, prepare meals, socialize with friends and family, go outdoors five days of the week, shop for food, watch television, count change, and use a checkbook. R. 68, 218–222, 279–83.

## **Claim History**

Clausen protectively filed for SSI and DIB on September 11, 2009, claiming that her disability began on June 1, 2008. R. 28. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 10–11, 28, 79–82. On July 14, 2011, ALJ Brian P. Kilbane held a hearing to consider Clausen's disability claim. R. 25, 49–77. Clausen was represented by an attorney at the hearing, which included testimony from Clausen, a friend, and vocational expert Gerald K. Wells, Ph.D. R. 28. At the evidentiary hearing, Clausen moved to amend the alleged disability onset date to June 1, 2009. R. 66.

On July 29, 2011, the ALJ entered his decision denying Clausen's claims. R. 41. The ALJ found that Clausen suffered from the severe impairments of disorders of the spine, attention deficit disorder ("ADD"), and anxiety disorder. R. 31. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 33. The ALJ further found that Clausen retained the RFC to perform light work, with the following limitations: (1) no climbing of ladders, ropes, or scaffolds; (2) limitations in pushing/pulling and overheard reaching with her upper extremities; and, (3) restriction to simple unskilled work that does not require good ability to maintain attention for extended periods of time. R. 36. The ALJ also found that Clausen was "only mildly limited in interacting with others, dealing with routine stressors, maintaining regular attendance, and completing a normal

workday/workweek; and, she would not require additional supervision to perform even detailed tasks." R. 36. The ALJ determined that Clausen could not return to her past relevant work as a housekeeper, cook, electrician's assistant, package handler, or construction laborer (R. 39), but that Clausen could work at jobs that exist in significant numbers in the national economy: namely, office helper, file clerk, and telephone information clerk. R. 40. Thus, the ALJ concluded that Clausen was not disabled. R. 40–41. On January 3, 2013, the Appeals Council denied Clausen's request for review (R. 10–12), and this appeal followed.

## ANALYSIS

Clausen seeks disability starting in June of 2009 due to spine disorders that she alleges cause pain and restrict her range of motion. The ALJ found that although her spine disorders were severe, the objective medical evidence indicated she could still perform light work at jobs that exist in significant numbers in the national economy. R. 31, 33–40. Clausen argues that the ALJ erred in concluding that she did not suffer from a musculoskeletal listing level impairment, by not giving controlling weight to the opinion of her treating physician Dr. Kennedy and the impairments he claims affect her, and by improperly discrediting her subjective complaints of pain.

### Listing

Clausen contends that she is entitled to benefits because she suffers from a herniated or bulging disc in her neck which qualifies as a "disorder of the spine" under the musculoskeletal listed impairment 1.04. A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). "When satisfied, the listings of impairments automatically result in a finding of disability. The listings are designed to reflect impairments that, for the most part, 'are permanent or expected to result in

5

death.'" Casillas v. Astrue, 3:09-CV-00076, 2011 WL 450426, at *4 (W.D. Va. Feb. 3, 2011) (citing 20 C.F.R. § 404.1525(c)(4)). It is well settled that Clausen must establish that she meets all of the requirements of a listing. Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

Listing 1.04(A) for disorders of the spine requires proof of the following:

**1.04 Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)…

20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.04.[4]

All listings for a musculoskeletal impairments, including Listing 1.04, require a showing of loss of function which impacts a claimant's ability to engage in competitive employment. The Social Security Administration defines loss of function as follows:

Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone.

20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(a). The "inability to ambulate effectively" is further defined as an "extreme limitation of the ability to walk; i.e., an impairment(s) that

---

[4] Clausen does not allege that she satisfies the alternative category B and C criteria relating to spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication that "do not pertain to the Claimant's condition." Pl's Br. Summ. J. 5. Thus, I will focus my analysis on the category A criteria.

6

interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(b)(1). This generally means that a claimant is unable to independently ambulate without the use of assistive devices. Id. An "inability to perform fine and gross movements effectively" is further defined as "extreme loss of function of both upper extremities" that similarly interferes with a claimant's ability to work by reaching, pushing, pulling, grasping, and fingering. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(c). Examples of an inability to perform fine and gross movements effectively include things like being unable to prepare a simple meal, feed oneself, or take care of personal hygiene. Id.

Clausen underwent an MRI on October 2, 2008, before her date of onset, which showed that she suffered from "diffuse cervical spondylosis at C3-4 through C5-6." R. 365. The MRI also revealed that Clausen had a disc protrusion at C3-4 paracentral to the left touching and slightly flattening the anterior cord, and a disc protrusion at C4-5 paracentral to the right and which was slightly calcified and slightly indenting the anterior cord. R. 365. A CT myelogram performed on March 10, 2010 showed that Clausen had a left paracentral disc protrusion at C3-4 causing mild central canal narrowing with mass effect on the cord, a partially calcified right paracentral disc protrusion at C4-5 causing mild central canal narrowing with mass effect on the cord, and a right paracentral disc protrusion at C5-6 causing mild right lateral recess stenosis and right neural foraminal stenosis with no significant central canal or left neural foraminal stenosis. R. 558–59. An EMG performed on Clausen's right upper extremity the same day showed that sensory and motor nerve conductions were normal as was the concentric needle exam on the right upper extremity and middle cervical paraspinal muscles. R. 587.

Assuming that Clausen has satisfied the first part of establishing that she suffers from a listing impairment under Listing 1.04 because she has bulging discs, some stenosis, and some

7

effect on the spinal cord—albeit quite mild—she must also demonstrate that her cervical spine disorder causes "compromise of a nerve root…or the spinal cord" along with "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)…" 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.04.

The ALJ found that the evidence did not establish "ineffective ambulation or inability to perform fine or gross movements effectively" under 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2). R. 34. The ALJ noted that, other than images showing degenerative changes of the cervical spine, there are "minimal objective or clinical findings of significant abnormality" and that "[m]ost physical examinations of record have failed to reveal significant loss of sensation or range of motion of any extremity" and adequate strength in her upper extremities. R. 34. Therefore, the ALJ found that Clausen did not meet or equal the criteria of a musculoskeletal listing. This finding is supported by substantial evidence in the record.

As to the listing criteria regarding pain, limitation of motion, and motor loss, the record shows conflicting evidence between Clausen's subjective complaints and objective findings of disability. Notably, the record reflects that Clausen continued to work after the alleged onset date of June 1, 2009. R. 444–45, 460–61, 501–502, 504. Further, when Clausen complained of pain and limitations, objective findings often failed to corroborate such complaints.

Clausen has a long history of pain complaints in her cervical and thoracic area. She reported to the emergency room on August 26, 2008 with complains of numbness in her left arm and pain under her left breast. R. 373–74. On physical examination, Clausen's neck was supple with full range of motion and an otherwise normal physical examination, including her extremities. R. 374. Clausen also underwent a series of epidural steroid injections ("ESI") at the

8

C6-7 level on November 5, 2008, November 19, 2008, and December 12, 2008 because of radicular pain her left shoulder and arm. R. 400, 413, 424. She underwent a second set of ESI's on October 12, 2009 and October 30, 2009 for the same pain complaints. R. 397, 442.

After the alleged onset date, in July 2009, Brian R. Baker, M.D. saw Clausen in the ER for back pain after lifting "very heavy boxes, some…up to 80 pounds" while at work. R. 460–61. Dr. Baker noted tenderness in the thoracic spine that caused pain, although there was no cervical pain, and no bony tenderness throughout her spine. R. 461. Dr. Baker diagnosed Clausen with an acute thoracic strain from heavy lifting at work and degenerative joint disease. X-rays were largely normal, showing nothing but a subtle scoliotic curve at T6-7. R. 486. Dr. Baker treated Clausen with muscle relaxants and ordered her off work for four days. R. 437, 486.

Clausen saw family physician Robert Kennedy, M.D. a number of times during the relevant period. On July 13, 2009, Clausen complained of radiating thoracic back pain, and Dr. Kennedy noted significant tenderness and spasm over her back muscles, but the record does not show any limitation of motion or weakness. R. 504. Dr. Kennedy prescribed pain medication. At a follow-up visit ten days later, Clausen received an injection which she tolerated well. R. 503. Clausen reported continued neck pain and Dr. Kennedy again noted tenderness at the end of July 2009. R. 502.

Clausen began a series of physical therapy visits with James Griffith, P.T., starting in August 2009. R. 444–58. At her initial visit, Clausen reported pain with limited range of motion ("ROM") while working. R. 457–58. Clausen reported a pain level of 5/5 in her mid-back, and 4/5 on right upper trapezius. R. 457–58. Griffith observed that Clausen's cervical active ROM flexion was 50% with severe pain centrally in C6 area; extension and left rotation was 25% with the same symptoms; her right rotation was 50% with only mild C6 pain; her upper extremity

9

active ROM flexion was with C6 pain; and, her internal rotations to L1 had bilateral pain in shoulders. R. 457–58. Griffith recommended continued physical therapy.

At her next visit on August 10, 2009, Clausen reported continued pain and tingling in her right scapular adductor and upper trapezius. R. 456. Griffith noted increased movement quality and pain control as a result of physical therapy. R. 456. At her third physical therapy visit on August 12, 2009, Clausen reported similar symptoms of pain and tingling. R. 454–55. Griffith found palpable banding and tenderness throughout Clausen's scapular adductor area. R. 454. Griffith noted that Clausen had "significant pain exacerbation" and although she "received slight relief with modalities" she had "very little activity tolerance." R. 454. Griffith indicated that further therapy was needed. R. 454. Clausen showed improvement on August 20, 2009, and Griffith noted that she had better response and pain relief, but she still had "extremely limited activity tolerance and pain levels." R. 452–53.

On August 26, 2009, Clausen reported tight, hot, prickly, stinging, and burning pain which caused her to draw up her right shoulder. R. 450–52. However, Griffith noted improvement upon her prior visits, finding that "[o]verall cervical and trapezius pain significantly reduced and essentially well controlled for last day or two." R. 450. Clausen still had "extremely limited activity tolerance and fairly high pain levels" and Griffith "[d]oubt[ed] [that] she can tolerate return to full duty for at least a couple of weeks." R. 450. Clausen received a doctor's note to extend her work absence until September 15, 2009. R. 434.

Clausen quickly saw improvement, however, reporting to Griffith in September 2009 that she was "doing better," that the burning sensation was much less frequent," and that she was "hardly taking any pain pills anymore." R. 448. Clausen continued her improvement, and at her next visit stated that "I think I can go back to work light duty." R. 446. Griffith shared in Clausen's optimism, writing that "she has an excellent chance of tolerating return to work at light

duty with a 20 [pound] limitation." R. 506. Clausen's ROM in her upper extremities and cervical spine were within functional limits with only slight back pain with rotation and extension. R. 446. Griffith confirmed increased movement quality and functional ability in his notes, and noted steady improvement with her pain in cervical spine and trapezius areas. On October 22, 2009, Griffith noted that Clausen had ceased scheduling physical therapy appointments and returned to work at light duty. R. 444. Indeed, Clausen "continued with increased activity tolerance but still had limitations below what she needed to have to return to full duty." R. 444.

On September 23, 2009, Clausen reported to Dr. Kennedy that she had tried to return to work with a 20-pound restriction but was unsuccessful. R. 501. After a complete physical with largely normal results, Dr. Kennedy diagnosed chronic neck pain, left knee pain, and ADD. R. 501. In October 2009, Clausen continued to report radiating right neck and shoulder pain. On physical examination, Clausen was extremely tender over the trapezius and levator scapular area. Her grip strength was 4/5 on the right. R. 500. Dr. Kennedy prescribed a Toradol shot, Prednisone, Hydroxyzine, and Hydromorphone. R. 500. In November 2009, Dr. Kennedy found shoulder tenderness and was instructed to target trigger points in her neck. R. 499. Clausen returned to see Dr. Kennedy in January 2010, reporting left arm and hand pain, but reported her right shoulder pain as "tolerable." R. 543. Dr. Kennedy noted that Clausen had a reduced ROM in her cervical spine and shoulder, although she had normal ROM in her thoracolumbar spine, elbow, hip, knee, ankle, and fingers. R. 541. Clausen saw David Fosnocht, M.D. after reporting an aggravating injury to her back. R. 606–607. Dr. Fosnocht noted normal movement in Clausen's upper extremities, back, and neck, although she exhibited some stiff movement. R. 606. Clausen's strength was normal, and Dr. Fosnocht diagnosed a muscle spasm. R. 606–607.

11

In February 2010, Clausen was examined by Dr. John Jane, a neurosurgeon at the University of Virginia. Dr. Jane ordered a CT myelogram and EMG which were performed on March 10, 2010. Dr. Jane wrote Dr. Kennedy on March 17, 2010, and reported that the tests revealed "a normal EMG with a small paracentral disc herniation without impingement on the nerve root." Dr. Jane found that Clausen did not have a surgical lesion and that conservative therapy was in order. R. 555.

Clausen reported to Dr. Kennedy on May 14, 2011 that she had pain at a 4/5 level in her neck and both shoulders, that the pain went down her arm, but it was not as bad as it used to be in her left arm. R. 598. Dr. Kennedy noted some diffuse tenderness in Clausen's thoracic and cervical paraspinal musculature, but that she had adequate grip strength bilaterally which was slightly weaker on the left. R. 598.

Based on the above records, there is substantial evidence in the medical record to support the ALJ's decision that Clausen did not meet or equal the requirements of Listing 1.04. Listing 1.04 requires a disorder that results in *both* the "compromise of a nerve root…or the spinal cord" as well as "evidence of nerve root compression" demonstrated by functional loss. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.04(A); see also Lehman v. Astrue, 931 F. Supp. 2d 682, 689 (D. Md. 2013). Notably, while an October 2008 MRI (prior to the alleged onset date) showed some cervical cord indentation from disc abnormalities, Dr. Jane found in 2010 a small disc herniation without any nerve root impingement. R. 555–56. Clausen cannot establish the necessary elements that she suffers from a spinal disorder under Listing 1.04 because the evidence does not show that she has any functional limitation caused by a compromised nerve root. The medical record documents Clausen's subjective complaints of pain and limitation, but the many treatment records from Dr. Kennedy and Griffith support the finding that Clausen's spinal disorder did not manifest disabling symptoms. The evidence also shows that Clausen responded well to non-

surgical treatment of her pain. Griffith's records in particular show significant improvement from physical therapy in August and September 2009, to the point that Clausen returned to work at light duty.

The evidence of record also does not establish that Clausen was unable to ambulate effectively or perform fine and gross movements effectively under the regulatory definitions requiring "extreme" limitations. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00. At no point was Clausen prescribed an assistive walking device, the hallmark of the inability to ambulate under the regulations. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(b)(1). Moreover, despite indication of pain and occasional reduced range of motion, the weight of the evidence shows that her impairments did not "very seriously" interfere with her ability to use her upper extremities for a sustained period, as she was responsive to largely conservative treatment. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(c). The medical record reflects that Clausen continued to work at times past the alleged onset date of disability—a fact that belies the notion of *per se* disability under the listings. R. 444–45, 460–61, 501–502, 504. Finally, Clausen reported the ability to do perform daily activities such as preparing simple meals, counting change, and going grocery shopping—things that a listing level spine disorder impairment would preclude. R. 218–22, 279–83; 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(c).

In conclusion, Listing 1.04 for disorders of the spine requires a showing that there is a functional limitation evidenced through nerve root compression consistent with a neuro-anatomic pain distribution, limitation of the motion of the spine and motor loss accompanied by sensory or reflex loss. Simply put, the record does not support that the minimal findings on the imaging and other objective studies caused the necessary functional limitations to prove a disorder of the spine. Thus, the evidence in total supports the ALJ's finding that Clausen did not have a listing level impairment under the regulations.

## Treating Physician

Clausen alleges that the ALJ also erred in weighing the opinions of her treating physician Dr. Kennedy. Pl.'s Br. Summ. J. 8–11. The ALJ considered three separate opinions of Dr. Kennedy regarding Clausen's functional ability. First, in July 2009, Dr. Kennedy noted in a check-the-box form that Clausen was "[u]nable to participate in employment and training activities in any capacity" for a period of less than 30 days. R. 435. Dr. Kennedy further noted that Clausen could not drive, could not lift more than 10 pounds, and could not stoop or carry anything. R. 436. Second, Dr. Kennedy filled out the same check-the-box form on October 2, 2009. R. 432. Dr. Kennedy stated that Clausen was unable to work for a period of 90 days, that she could not lift, twist, stoop, or bend, and could not concentrate. R. 432–33.

The third, and most comprehensive, opinion of Dr. Kennedy came in the form of an RFC questionnaire from July 12, 2011. R. 599–604. Dr. Kennedy diagnosed Clausen with cervical degenerative disc disease and ADHD, with symptoms of severe pain in her neck radiating to her back and right shoulder. R. 600. Dr. Kennedy noted that Clausen's pain would constantly interrupt her concentration; she could walk two blocks without rest or severe pain; sit for more than two hours at a time and 6 hours out of an 8-hour workday; stand or walk for about 2 hours total out of an 8-hour workday; and that she would need a job that requires shifting positions from sitting, standing and walking. R. 601–602. Additionally, Clausen would need two to three 5–15 minute breaks per shift. Dr. Kennedy also thought that she could not lift nor carry 10, 20 or 50 pounds, and that she can only rarely carry less than 10 pounds. R. 599–604. Furthermore, Clausen could never look down or hold her head in static position; could only rarely turn her head to the right or look up; had a 50% limitation of left hand grasping; and a 75% limitation on left arm reaching. R. 599–604. Dr. Kennedy ultimately concluded that Clausen would miss more than four days a month as a result of her impairments. R. 603.

The ALJ gave "no significant weight" to the functional assessments rendered by Dr. Kennedy, finding that the "degree of severity" in the assessments "lacks support and consistency with the other evidence, including Dr. Kennedy's own treatment notes." R. 38. The social security regulations require that an ALJ give the opinion of a treating source controlling weight, if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ must give good reasons for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Saul v. Astrue, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5). None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion. Ricks v. Comm'r, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010).

Having reviewed the record, I find substantial evidence for the ALJ's decision to give Dr. Kennedy's opinion "no significant weight." Dr. Kennedy's treatment notes indicated that Clausen had complained of pain in either or both arms and shoulders at every visit. R. 431–37, 499, 501–505, 543. The imaging studies showed that Clausen had only mild to moderate changes in her cervical spine. R. 552–56. Additionally, Dr. Kennedy's notes indicated that physical therapy was very successful in a short amount of time. R. 446–58. The physical therapist's report and discharge summary are part of Dr. Kennedy's records, and they indicate a 75%

improvement; that she could lift and shift heavy boxes; and that Clausen wanted to go back to work because she was functioning better. R. 444, 506. Thus, Dr. Kennedy's own records are inconsistent or unsupportive of his opinions of functionality from July 2009, October 2009, and July 2011.

When Dr. Kennedy's RFC is viewed against the records of Drs. Jane (R. 555–62), Nazir (R. 367–68), Folsom (R. 369–71), Fosnocht (R. 606), Amos (R. 293–308), and Cianciolo (R. 563–64), it is inconsistent with the record as a whole. The 2010 physical RFCs from state agency physicians Dr. R.S. Kadian (R. 248–50) and Dr. William Amos (R. 301–303) align more with the weight of the evidence, and the ALJ properly adopted their physical restrictions. R. 38. In total, the records and opinions of Clausen's other examiners and evaluators undermine the credibility of Dr. Kennedy's opinion suggesting disabling limitations. Therefore, because Dr. Kennedy's RFC is both internally inconsistent and inconsistent with the record as a whole, the ALJ properly discounted Dr. Kennedy's opinions.

## **Credibility**

Clausen asserts that the ALJ erred by using circular logic with boilerplate language in discrediting Clausen's subjective complaints of pain. In his discussion of Clausen's residual functional capacity, the ALJ found that Clausen's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual capacity assessment." R. 36. I disagree that the ALJ committed reversible error.

The ALJ determines the facts and resolves inconsistencies between a claimant's alleged impairments and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Clausen's subjective complaints of disabling symptoms are not conclusive. Rather, the ALJ must examine all of the evidence, including the objective medical record, and determine whether

Clausen has met her burden of proving that she suffers from an underlying impairment which is reasonably expected to produce her claimed symptoms alleged. Craig v. Chater, 76 F.3d 585, 592–93 (4th Cir. 1996). This assessment requires the ALJ to evaluate the intensity and persistence of Clausen's claimed symptoms and the affect those disabling conditions have on Clausen's ability to work. Id. at 594–95. A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

Clausen argues that the Seventh Circuit decisions in Bjornson v. Astrue, 671 F.3d 640 (7th Cir. 2012) and Shauger v. Astrue, 675 F.3d 690 (7th Cir. 2012), support her argument that the ALJ's credibility language presents a logical fallacy.[5] The thrust of Clausen's position regarding the specific boilerplate language made by the ALJ here comes from Bjornson, in which the Seventh Circuit criticized the same language stating:

> One problem with the boilerplate is that the assessment of the claimant's "residual functional capacity" (the bureaucratic term for ability to work) comes later in the administrative law judge's opinion, not "above"— above is just the foreshadowed conclusion of that later assessment. A deeper problem is that the assessment of a claimant's ability to work will often (and in the present case) depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.

---

[5] Clausen also cites Duff v. Astrue, 5:11CV00103, 2012 WL 5993518 (W.D. Va. Nov. 30, 2012) to support her argument that her credibility was wrongly discounted. However, the report and recommendation on which Clausen relies was later rejected by the district judge in an opinion that did not address the argument regarding credibility. Duff v. Astrue, 5:11CV103, 2013 WL 443770 (W.D. Va. Feb. 5, 2013).

17

Bjornson, 671 F.3d at 645.

Recent cases from districts in the Fourth Circuit have recognized that the use of such boilerplate language is acceptable "where the ALJ explains his conclusions adequately." Jones v. Colvin, 5:12-CV-00567-FL, 2013 WL 5460197, at *15 (E.D.N.C. Sept. 30, 2013); see also Mascio v. Colvin, No. 2:11–CV–65–FL, 2013 WL 3321577, at *3 (E.D.N.C. July 1, 2013). "Inclusion of what was in effect credibility boilerplate in an otherwise valid decision does not render the decision in [a]… case fatally defective." Martin v. Colvin, 5:12CV00066, 2013 WL 4451230, at *7 (W.D. Va. Aug. 16, 2013). Indeed, the disability claim in Bjornson was remanded not because of the particular boilerplate language, but because the ALJ "failed to build a bridge between the medical evidence ... and the conclusion that [the claimant] is able to work full time." Bjornson, 671 F.3d at 649.

In this case, the ALJ's opinion sufficiently connected his conclusion regarding Clausen's credibility to the medical evidence, and his decision is supported by substantial evidence. Clausen testified that she has severe pain in her arms that causes them to be useless. R. 37. Additionally, she claimed that she had depression and panic attacks that occurred two-to-three times a week. R. 37. She claimed to have trouble with her personal needs, and stayed in bed most days. R. 37.

The ALJ discusses the inconsistencies in Clausen's testimony by noting the multiple instances in the record that reflect that she continued to work after her alleged onset date. R. 37, 446–49, 457–58, 461, 475, 502. The fact that Clausen continued working after June 1, 2009 was a proper basis for the ALJ to discredit Clausen's subjective testimony. See, e.g., Childers v. Astrue, 1:09CV225, 2012 WL 1267897, at *10 (M.D.N.C. Apr. 16, 2012) ("Plaintiff's continued work…long after her alleged onset date, documented throughout the record … represents the most significant evidentiary conflict.").

Next, the ALJ compares the severity of Clausen's claims against the record as a whole, noting both support and inconsistency in the evidence. R. 37. He notes that other than injections, her treatments have consisted of physical therapy, epidurals, and medication. R. 37. There is also an unexplained gap in treatment from May 2010 to May 2011. R. 37. Further, Clausen has not been referred for surgery, her treatments with the physical therapist improved her pain and functioning, and she reported she used her medications only rarely. R. 34–37. The ALJ concluded that although Clausen alleges extreme functional limitations due to pain, including difficulty walking and using her hands, there are only minimal objective medical findings of any abnormality of any extremity. R. 37. Clausen's tests have revealed only mild deformities that have required minimal treatments, and her repeated physical examinations failed to reveal decreased strength, sensation, and range of motion as one would expect with the degree of pain and restriction alleged.

I find that this analysis of credibility is supported by substantial evidence. Clausen essentially asks the court re-weigh the evidence before the ALJ, something I decline to do. It is evident that the ALJ's finding that Clausen is not fully credible is supported by substantial evidence in the record. Accordingly, Clausen's objection to the ALJ's decision regarding boilerplate language is without merit.

## Conclusion

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of

record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

                                           Enter: February 7, 2014

                                           *Robert S. Ballou*

                                           Robert S. Ballou
                                           United States Magistrate Judge